**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Jesse Junior HILL, Defendant-Appellant.**

**No. 11830.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 16, 1981.

Appellant's Motion for Rehearing and to Transfer Denied April 6, 1981.

David Robards, Stephen P. Carlton, Joplin, for defendant-appellant.

John Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Chief Judge.

The defendant was charged with capital murder. He was found guilty of manslaughter and sentenced to imprisonment for 10 years as assessed by the jury. He presents eight points on appeal.

The scene of the episode was the house of Fred Pulley at 427 Schifferdecker in Joplin. At the time in question, according to one resident, five men and three women were living in the house, including Frank Haynes. Apparently, the defendant had been there for a week or so. Haynes, the defendant, and at least one other spent the night of May 18 and the morning of May 19, 1979, drinking. About 9:00 a. m. a neighbor arrived and spent 30 to 40 minutes in the company of Pulley, Haynes and the defendant. The neighbor was of the opinion they were all drunk. Haynes and the defendant were quarreling, with Haynes agitating the defendant. The neighbor left the house to join Pulley in the front yard where Pulley was visiting with his daughter who had driven in the driveway.

In a few minutes Haynes and the defendant came out of the front door swinging at each other. The defendant told an investigating officer "that he had struck Mr. Haynes in the face and the mouth area and had knocked him out of the residence and off of the front porch where he landed in the front yard". In this connection, Haynes was 5 feet 8 or 9 inches tall and weighed 150 pounds and the defendant was 6 feet tall and weighed 200 pounds. Haynes came to rest in the front yard in such a position the neighbor could not see him because of a truck parked in the driveway. However, the neighbor said that from seeing the defendant from the waist up, it appeared as if the defendant was kicking Haynes. To another officer the defendant said he knocked Haynes through the front door and then kicked him several times.

When the neighbor and Pulley came around the truck, Haynes was on the ground unconscious, bleeding from the mouth and nose. They tried to talk to Haynes, but "he was knocked out." Pulley went in the house, got a bucket of water and poured it on Haynes' head. This caused Haynes to move or stir around. Out of caution, the neighbor went home from where he saw the police and ambulance arrive in about 30 to 40 minutes.

There was no direct evidence concerning the cause of the violence. The neighbor related that the defendant had told Haynes to shut up a time or two, the latter time waving his fist. There was evidence the trouble between the two was over an old incident and over one of the female residents. The defendant told the officers Haynes had threatened him and Pulley with a butcher knife. The police found a steak knife in Haynes back pocket. However, the defendant also said "he had got even for the incident that happened in the past."

As the defendant vigorously questions the cause of Haynes subsequent death, the evidence concerning his condition must be stated in detail. There was little evidence concerning his condition before the violence. Haynes had a reputation as an alcohol and drug abuser and for violence. Another of the residents of the house related that at an undetermined time before May 19, 1979, Haynes was forced from a car and "mauled" around some by several men. However, the resident said that after that Haynes had no trouble in drinking and having a good time.

The first officer to arrive, who had been trained as an emergency medical technician, found Haynes lying in the yard semiconscious with Pulley and the defendant standing beside him. On his first examination the officer found Haynes to be unresponsive but that his pupils were equal and responsive. He checked again 15 to 20 minutes later. At that time one pupil was extremely pinpointed and the other almost completely dilated. Haynes was having trouble breathing. The officer concluded that Haynes had damage to his central nervous system.

Upon examination at the hospital, Haynes was in a deep coma and unresponsive. He had an abrasion on the left jaw and abrasions on the chest and legs. There was a laceration at the base of the nose which was sutured. His blood alcohol was .42%. His treating physician stated the coma resulted from a head injury and not from alcohol. Haynes' pupils were dilated and fixed. His condition was regarded as

life threatening. It was determined that he had a massive acute left frontal temporal parietal subdural hematoma. A craniotomy was performed and the subdural hematoma removed. The hematoma was observed to cover almost the entire left hemisphere of the brain. On May 24, 1979, a tracheotomy was performed. Haynes was a patient until June 11, 1979. He remained in a coma, unresponsive and a quadriplegic.

On June 11, 1979, Haynes was admitted to the Missouri State Chest Hospital. There is little evidence concerning his course at that institution. The nurses notes of September 9, 1979, included "fairly good lunch, attempted to talk with family, speech is still garbled and incoherent at times, much more alert". The custodian of the records deciphered the physician's illegible notes to include, September 17, 1979, "Eating well, start talking, few words—and something—improved"; and on October 1, 1979, "Start talking some, might transfer him to rehabilitation center."

On October 5, 1979, Haynes was transferred to a skilled nursing facility. He was comatose, quadriplegic, had irregular eye movement and hydrostatic congestion. He had assumed the fetal position. He had an ankle clonus of the right ankle, which demonstrated very severe brain damage. Haynes died October 8, 1979.

The treating physician who removed the hematoma in response to a hypothetical question embodying the violence and Haynes subsequent condition gave his opinion that it was possible the hematoma was caused by trauma, possibly the blow that produced the laceration at the base of Haynes' nose. Later he concurred in an opinion that the subdural hematoma caused Haynes' death. He related that a subdural hematoma can develop spontaneously but that alcohol does not cause such a hematoma or make an individual more susceptible to such a hematoma. He testified that the rupture of a vein in the brain can have a delayed effect, as long as four days. But, he added, during the development of a hematoma the individual's sensorium decreases. He observed that if, before the vio-

lence, Haynes was able to badger or agitate the defendant, Haynes sensorium was not diminished. On cross-examination this physician made the following statements which form the principal basis for the defendant's argument on causation: If Haynes came out of the coma, that would be a significant fact; if Haynes regained consciousness completely, he might re-evaluate his opinion concerning the cause of death; if Haynes was able to talk, it would have been helpful to gather further information concerning his condition immediately before and after death.

The physician who attended Haynes at the time of his death stated that the death resulted from coma from a subdural hematoma. He stated that trauma is the leading cause of a subdural hematoma and that in his opinion Haynes' subdural hematoma had to be caused by a very severe blow. He further related that a subdural hematoma can be caused by a blow with no visible exterior mark and can be located adjacent to the blow, opposite the blow or obliquely from the blow. He too stated that a rupture or vein in the brain can go unnoticed for a long period of time, but when it is severe, it does not go unnoticed because "usually they may be comatose, they may have a headache, may have dizziness and may have an anesthesia on one hand they may be quadripledic as this patient was". This physician also denied a relationship between alcohol or drug abuse and a subdural hematoma.

The defendant's first point is that the evidence was not sufficient to establish that the defendant caused the death of Haynes. He emphasizes the prior mauling of Haynes, the minor nature of the laceration under the nose and abrasions on the jaw, and the absence of external evidence of injury over the site of the hematoma. He particularly emphasizes the answers of the treating physician concerning the record evidence that Haynes regained consciousness and was able to speak.

 To establish that an act of the defendant caused the death of Haynes, the evidence need not exclude all other possi-

bilities. *State v. Frazier*, 339 Mo. 966, 98 S.W.2d 707 (1936) and *Holtkamp v. State*, 588 S.W.2d 183 (Mo.App.1979). That causal connection can be established by competent medical testimony that it was so caused, *State v. Frazier*, supra, or that it could have been so caused when such an opinion is supported by corroborating evidence. "Although admitting that such a hemorrhage could happen to any person without prior trauma, he testified in answer to a hypothetical question that he thought the history of the fight and being struck could have brought on the problem which resulted in death. From such evidence, the trier of facts could infer causation and responsible agency." *In re In Interest of T____ G____*, 455 S.W.2d 3, 10 (Mo.App.1970). Also see *State v. Johnson*, 475 S.W.2d 95 (Mo.1971); *State v. Sykes*, 436 S.W.2d 32 (Mo.1969); *State v. Sykes*, 372 S.W.2d 24 (Mo.1963); *Holtkamp v. State*, supra. The attending physician testified without objection and without equivocation that the cause of Haynes' death was coma due to subdural hematoma. He added that the subdural hematoma had to be the result of a severe blow. The treating physician in response to a hypothetical question testified that the hematoma was possibly, in the sense of could have been, caused by a blow from the defendant and that the hematoma caused death. The latter's statement on cross-examination, including the statement that if Haynes completely regained consciousness, he might have to re-evaluate his opinion as to the cause of death, does not render his testimony so equivocal as to have no value. *State v. Frazier*, supra. There was evidence that before the violence Haynes was in his normal condition, although drunk, and that after the violence he was unconscious and within a matter of an hour or two it was determined that he had a massive acute subdural hematoma. The fact the defendant hit and kicked Haynes in such a manner so as to cause a hematoma is established by the testimony of the neighbor and confirmed by the admission of the defendant that with one blow he knocked Haynes off the porch and then kicked him. This was most certainly corroborating evidence. The cause of death was sufficiently established and this point is denied. *State v. Johnson*, supra; *State v. Banister*, 512 S.W.2d 843 (Mo.App.1974); *In re In Interest of T____ G____*, supra.

By an interrelated point, the defendant contends the trial court erred by not giving instructions on the various degrees of assault as lesser included offenses. This point is based upon the proposition that the jury should have been permitted to find the defendant did not cause the death of Haynes and convict the defendant of some degree of assault rather than to acquit him. The test for determining whether or not an offense is a lesser included offense has been clearly stated in *State v. Smith*, 592 S.W.2d 165 (Mo. banc 1979). The test is also stated in § 556.046.1, RSMo 1978. However, even assuming the various degrees of assault to have been lesser included offenses, the duty of the trial court to instruct on those lesser included offenses was not absolute. Of course, this is not true of the "automatic submission" rules involved relative to the necessity of instructions on the various degrees of homicide. See MAI–CR2d 15.00. This opinion does not pertain to the duty to give such instructions.

The duty involved is now defined by statute. Section 556.046.2 provides: "The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." The key phrase of that section is "a basis for a verdict". It could be argued that the jury's disbelief of the evidence necessary to establish an element of the greater offense is such a basis. However, such a construction would require an instruction on a lesser included offense in the vast majority of cases. It is appropriate to construe a statute with reference to the comment accompanying that statute when enacted. *State v. Stiers*, 610 S.W.2d 83 (Mo.App.1980); *State v. Gullett*, 606 S.W.2d 796 (Mo.App. 1980). The applicable comment indicates that it is an adoption of the existing general rule and cites *State v. Craig*, 433 S.W.2d

811 (Mo.1968). *Craig* declares: "In order to require the giving of an instruction on the included or lesser offense there must be evidentiary support in the case for its submission." *Craig*, 433 S.W.2d at 815. Also see *State v. Achter*, 448 S.W.2d 898 (Mo. 1970). Even if the jury were to "disbelieve some of the evidence of the State, or decline to draw some or all of the permissible inferences, [this] does not entitle the defendant to an instruction otherwise unsupported by the evidence, on the issue of accidental homicide pursuant to § 559.050, . . . ." *Achter*, 448 S.W.2d at 900. It has consistently been held that an instruction on a lesser included offense is required only where there is evidence with probative value which could form the basis of an acquittal of the greater offense and a conviction of the lesser included offense. *State v. Howell*, 524 S.W.2d 11 (Mo. banc 1975); *State v. Haynes*, 329 S.W.2d 640 (Mo.1959); *State v. Coffmann*, 360 Mo. 782, 230 S.W.2d 761 (1950). The statute must be so construed. *State v. Mays*, 598 S.W.2d 613 (Mo. App.1980); *State v. Owens*, 598 S.W.2d 174 (Mo.App.1980); *State v. Decker*, 591 S.W.2d 7 (Mo.App.1979).

■ In this case there is a total absence of evidence with any probative value that Haynes' death was caused other than by a blow of the defendant. The statement of the treating physician that he might reevaluate his opinion as to the cause of death if in fact Haynes totally regained consciousness or talked is not such evidence. This is not evidence that his opinion in fact did change. An instruction based on this possibility or the possibility of an injury in the mauling or of a spontaneous hematoma, particularly in the absence of any circumstances corroborating any such cause of death, would have been based on sheer speculation and need not have been given. This point is denied.

■ In another related point the defendant asserts error because the trial court failed to instruct on attempted manslaughter as a lesser included offense. This point is presented upon the same proposition concerning the cause of death presented under

the previous point. Section 556.046 provides that a defendant may be convicted of an offense included in an offense charged and that an offense is so included when "(3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein." The comment to § 564.011 in part provides:

> Present law permits a defendant charged with attempt to argue that he is innocent because he actually went through with the crime. By eliminating failure as an element of attempt, the section avoids the problem of losing a conviction on a charge of attempt when the evidence shows that the offense was completed. Since failure is not an element, attempt clearly is a lesser included offense. See § 556.046, subsection 1(3).

Assuming, without deciding, that this comment correctly declares the law, the trial court did not err in failing to instruct on attempted manslaughter for two reasons.

First, as stated, there must be an evidentiary basis for an instruction on an attempt rather than disbelief of the evidence in regard to some element of the completed offense. Otherwise, an instruction on attempt would be required in virtually every case. As discussed above, there is no evidence with probative value to provide a "basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense". § 556.046.2.

Second, as noted in the comment referred to, "[t]here will be situations where, as now, attempt convictions will not be possible because the attempt can require a higher culpable mental state than does the completed offense." Had the defendant taken a substantial step, "with the purpose", § 564.011, of killing Haynes, he would not have been guilty of manslaughter. The point is denied.

■ The defendant next asserts the verdict-directing instruction on manslaughter was prejudicially erroneous. The portion of Instruction No. 6, patterned on MAI–CR2d 15.18, that contained the alleged prejudicial error reads as follows:

If you find and believe from the evidence beyond a reasonable doubt that on or about May 19, 1979, in the County of Jasper, State of Missouri, the defendant caused the death of Frank Haynes by striking or kicking him, and that the death was not a justifiable homicide as submitted in Instruction No. 9 & 10 or *was* an excusable homicide as submitted in Instruction No. 11, then you will find the defendant guilty of manslaughter.

The error was the insertion of the word "was". The prejudicial effect of this obvious error is to be judicially determined. V.A.M.R. Crim. Rule 28.02(e). In such determination, all instructions are to be construed together. *State v. Holt*, 592 S.W.2d 759 (Mo. banc 1980). Instruction No. 4 submitting second-degree murder in referring to a justifiable homicide or an excusable homicide read correctly, that is without the "was". Instruction No. 11, modeled on MAI–CR2d 2.28 submitted the issue of an excusable homicide and clearly instructed the jury.

You will acquit the defendant on the ground of excusable homicide and return a verdict of not guilty if the death of Frank Haynes was the result of accident or misfortune upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner.

The error, even when Instruction No. 6 is considered by itself, is so obvious it is impossible to believe the jury was misled. When the instructions are considered together, it is inconceivable to believe the jury could have harbored the thought that if they believed the homicide was excusable as defined in Instruction No. 11, they should nonetheless find the defendant guilty of manslaughter. Compare *State v. Brame*, 542 S.W.2d 591 (Mo.App.1976); *State v. Cook*, 463 S.W.2d 863 (Mo.1971). The defendant's closing argument emphasizing excusable homicide as a defense to all offenses submitted demonstrates he was not misled and the jury could not have been misled by the inadvertent error. *State v. Holt*, supra. The error was not prejudicial and the point is denied.

The defendant's next point is that the trial court erred in failing to sustain his motion to dismiss the indictment because the grand jury did not hear evidence of the death of Haynes. It is true that a motion to dismiss the indictment will be sustained where the grand jury hears no evidence. *State v. Grady*, 84 Mo. 220 (1884). However, "[a] majority of jurisdictions adhere to the rule that, where there is some evidence before the grand jury tending to connect the accused with the offense charged, the lack of evidence upon some essential element of the offense is not a ground for quashing the indictment." Annot., Indictment—Quashing—Evidence, 59 A.L.R. 567, p. 579. It is established in Missouri the grand jury is the judge of the sufficiency of the evidence it hears, *State v. Brown*, 588 S.W.2d 745 (Mo.App.1979); *State v. Robinson*, 585 S.W.2d 515 (Mo.App. 1979), and that this state adheres to the majority rule. *State ex rel. Clagett v. James*, 327 S.W.2d 278 (Mo. banc 1959); *State v. Selle*, 367 S.W.2d 522 (Mo.1963); *State v. Shawley*, 334 Mo. 352, 67 S.W.2d 74 (1933); *State v. Faulkner*, 185 Mo. 673, 84 S.W. 967 (1905); *State v. Bragg*, 220 S.W. 25 (Mo.App.1920); *State v. Randolph*, 139 Mo.App. 314, 123 S.W. 61 (1909). In this case the grand jury heard the testimony of three witnesses as to the assault and received medical records and statements of witnesses Harris, Pulley and appellant. The point is denied.

The defendant further asserts error because the trial court refused to admit certain hearsay evidence. The defendant offered to prove that when one Michael Ryan was being admitted to a hospital on May 19, 1979, he told an employee that he had hurt his ankle in a fight with Haynes. The defendant contends this tended to prove a source of the hematoma other than the defendant and was admissible because it was against the penal interest of the declarant. The trial court did not err in refusing this evidence. It was not shown in any way that Ryan's alleged fight with Haynes was under such circumstances that

the declaration was against Ryan's penal interest. Further, it has consistently been held that declarations against penal interest are not admissible in criminal cases. *State v. Brown*, 404 S.W.2d 179 (Mo.1966); *State v. Ivicsics*, 604 S.W.2d 773 (Mo.App.1980); *State v. Grant*, 560 S.W.2d 39 (Mo.App. 1977). While that question is now under consideration by the Supreme Court in *State v. Turner*, No. 61975 (submitted January, 1981), even if that rule is changed that reversal is not applicable to the trial of this case. *State v. Shafer*, 609 S.W.2d 153 (Mo. banc 1980).

The defendant contends the trial court erred in not declaring a mistrial when a witness in a voluntary unresponsive answer stated the defendant had been involved in assaults. The same witness had previously given an unresponsive similar answer. The defendant contends these answers were improper references to other crimes. Even assuming that to be so, it does not follow that the trial court was required to declare a mistrial even though that was the only relief requested by the defendant. The declaration of a mistrial is a drastic remedy to be employed only in extraordinary circumstances. *State v. Jones*, 594 S.W.2d 932 (Mo.1980). Whether or not improper evidence is so prejudicial as to require that drastic remedy is a determination to be made by the trial court in the sound exercise of its discretion. *State v. Harris*, 547 S.W.2d 473 (Mo. banc 1977). The remarks in question did not attribute any grievous crime to the defendant, and in fact did not necessarily attribute any crime to the defendant. *State v. Johnson*, 496 S.W.2d 852 (Mo.1973). They were isolated remarks not sought or emphasized by the state. There is nothing in the record to establish they were so prejudicial as to require a mistrial. *State v. Lira*, 372 S.W.2d 80 (Mo.1963); *State v. Cox*, 590 S.W.2d 378 (Mo.App.1979). The fact the defendant sought no relief other than a mistrial cannot aid him. *State v. Cuckovich*, 485 S.W.2d 16 (Mo. banc 1972). The trial court did not err.

The defendant's last contention is that the trial court erred in admitting evidence that the defendant had a reputa-tion for being aggressive and a heavy drinker. This testimony was elicited by the state only after the defendant had by cross-examination of the state's first two witnesses established that Haynes had a reputation for fighting and alcohol and drug abuse. The defendant had made it known he intended to rely upon the defense of self-defense. No evidence had been developed to establish that the defendant knew of Haynes' reputation to cause that reputation to be otherwise admissible. See *State v. Smart*, 328 S.W.2d 569 (Mo.1959). Yet, as stated in defendant's brief "the defense strategy was to bring out Haynes' bad reputation to influence the jury's verdict." Under the circumstances, by presenting evidence of Haynes' reputation, the defendant opened up the issue of who was the aggressor. "When the defendant placed the issue of the victim's reputation as a violent and turbulent man before the jury, he also placed his own." *State v. Page*, 577 S.W.2d 177, 178 (Mo.App.1979). Also see *State v. Robinson*, 344 Mo. 1094, 130 S.W.2d 530 (1939); *State v. Dancy*, 541 S.W.2d 35 (Mo. App.1976); *State v. Scaturro*, 509 S.W.2d 491 (Mo.App.1974). The judgment is affirmed.

PREWITT, P. J., and HOGAN and BILLINGS, JJ., concur.